# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### COOKEVILLE DIVISION

| | | |
|---|---|---|
| BILLY HOWARD SCANTLAND, | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 2:11-cv-00083 |
| v. | ) | JUDGE WISEMAN |
| | ) | MAGISTRATE JUDGE BROWN |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

To:     The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Billy Howard Scantland's applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title II and Title XVI of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge are Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Response. (Docket Entries 15, 16, 17). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 9). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

## I.  INTRODUCTION

Plaintiff first filed for SSI and DIB on March 10, 2004, with an alleged onset date of April 18, 2003. (Tr. 105-08). Plaintiff's earnings record shows that he had sufficient quarters of coverage to remain insured through December 31, 2008. (Tr. 606). His claims were denied

initially on May 6, 2004 and on reconsideration on August 27, 2004. (Tr. 93-94, 100-103). He

requested a hearing before the ALJ, which was held on March 13, 2006 before ALJ Jack B.

Williams. (Tr. 91, 570-90). A supplemental hearing was held on May 31, 2007 to hear

testimony from Dr. Julian Nadolsky. (Tr. 591-602). On June 13, 2007, the ALJ issued an

unfavorable decision. (Tr. 48-59). Plaintiff requested review by the Appeals Council on July 17,

2007. (Tr. 65). The Appeals Council acted on November 20, 2008, remanding the case to the

ALJ for further proceedings. (Tr. 39-41). A second hearing was held on April 29, 2009. (Tr. 32-

35, 603-20). ALJ Williams issued an unfavorable decision on September 25, 2009. (Tr. 13-25).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since April 18, 2003, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease of the neck, osteoarthritis, cervical post laminectomy syndrome, and spondylosis (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 1, 1957 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date last insured for disability insurance benefits (20 CFR 404.1563 and 416.963).

8. The claimant completed high school, but evidence shows he has only "marginal"

to "limited" literacy. Therefore, for purposes of this decision it is found that he is not illiterate and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from April 18, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

This action was timely filed on August 9, 2011. (Docket Entry 1).

## II.  REVIEW OF THE RECORD

Plaintiff was born on January 1, 1957. (Tr. 573). He is married and lives with his wife, who does not work due to a "nerve problem." (Tr. 369, 582). Plaintiff graduated from high school in 1975 and has past work experience as a logger and furniture assembler. (Tr. 573-75). Plaintiff claims disability because he suffers from constant pain in his neck and back caused by osteoarthritis, degenerative disc disease, spondylosis, and cervical post laminectomy syndrome. (Docket Entry 16). Plaintiff has not worked since April 18, 2003, the alleged onset date. (Tr. 579).

### A.    **Medical Record**

On December 29, 1994, Plaintiff underwent a cervical laminectomy at C6-7, right, which was performed without complications. (Tr. 212). Plaintiff was discharged on December 31, 1994 with a prescription for Soma and Lortab. *Id.*

Plaintiff made numerous visits to Dr. Clarence L. Jones, his primary care physician,

between June 9, 1999 and April 7, 2003.  (Tr. 265-84).  Dr. Jones's treatment notes reflect that Plaintiff visited on June 9, 1999 complaining of lower neck and upper back pain, and Plaintiff was prescribed Soma, Propoxyphene, and Amitryptiline.  (Tr. 284).  While Dr. Jones indicated on October 5, 1999 that Plaintiff was abusing his medications, he continued to prescribe Soma and Propoxyphene through November 21, 2000.  (Tr. 279-84).

On April 30, 2001, Dr. Jones diagnosed Plaintiff with a ruptured cervical disc, back pain, and medication abuse, prescribing Tylenol 3 and Soma.  (Tr. 278).  Dr. Jones also diagnosed Plaintiff with degenerative arthritis on August 7, 2001.  (Tr. 277).  On December 3, 2001, Dr. Jones noted that neck-stretching exercises had improved Plaintiff's condition.  (Tr. 276). Plaintiff reported during his April 11, 2002 visit that he was in severe pain, and Dr. Jones prescribed Hyrdocodone.  (Tr. 274).  Although Dr. Jones noted medication addiction, during Plaintiff's May 10, 2002 visit he continued Plaintiff on Hydrocodone and prescribed Carisoprodol, and also indicated his intention to send Plaintiff to a pain clinic.  (Tr. 273).  On August 1, 2002, Dr. Jones prescribed Lortab and Soma.  (Tr. 270).  Plaintiff reported on October 7, 2002 that the neck-stretcher he was using did not relieve his pain, and Dr. Jones noted that he would need surgery.  (Tr. 268).  Dr. Jones indicated on December 31, 2002 that Plaintiff's condition was improving, but also that he would no longer prescribe Hyrdocodone because Plaintiff was addicted.  (Tr. 266).  On April 7, 2003, Dr. Jones noted that Plaintiff had benign hypertension and again prescribed Hyrdocodone for his back and neck pain.  (Tr. 265).

In October 2001, Dr. Jones referred Plaintiff to Neurosurgical Associates for a surgical consultation regarding his back and neck pain.  (Tr. 222).  On October 2, 2001, Dr. William R. Schooley diagnosed Plaintiff with cervical spondylosis and cervical radiculopathy and scheduled a repeat MRI of his cervical spine.  *Id.*  An October 30, 2001 MRI of his cervical spine showed

4

cervical spondylosis with degenerative disc disease and dorsal osteophytes with uncovertebral spurring at C4-5, central and left paracentral disc protrusion at C5-6, and a right dorsal osteophyte and/or broad based disc bulge at C6-7, with some associated cord thinning. (Tr. 237-38). Dr. Schooley set Plaintiff up for cervical traction. (Tr. 221).

Plaintiff made three visits to Dr. Schooley between November 27, 2001 and February 13, 2002. (Tr. 221). On November 27, 2001, Dr. Schooley noted that traction was beginning to give Plaintiff some relief, and on January 9, 2002 he reaffirmed that traction was helping and noted Plaintiff's desire to go back to work. *Id.* On February 13, 2002, Dr. Schooley noted that Plaintiff's neck pain had gotten worse and that he was now complaining of low back and left leg pain. *Id.* Dr. Schooley also recommended that Plaintiff stop taking Lortab and Soma. *Id.*

From April 8, 2002 through October 23, 2006, Plaintiff also visited Dr. J. Lee Copeland about once or twice a month for cervical radiculopathy treatment. (Tr. 394-468). Plaintiff continually reported pain in his neck, back, and arms, and after his initial visit Dr. Copeland prescribed Celebrex, Medrol, and Lortab. (Tr. 468). During each subsequent visit, Dr. Copeland refilled Lortab for Plaintiff's pain, and did not note any medication abuse during this time. (Tr. 394-468).

At the request of Dr. Copeland, on August 20, 2002 Plaintiff had an MRI and X-rays of the cervical spine and lumbar spine, and X-rays of the bilateral hips. (Tr. 386-90). The MRI of the cervical spine revealed spinal stenosis at C4-5 and C6-7 secondary to bony degenerative disc changes and left paracentral disc herniation at C5-6, while the X-rays of the cervical spine showed degenerative disc disease at C4-5, C5-6, and C6-7 with bilateral neural foraminal stenosis and probable spinal stenosis. (Tr. 386, 389). Degenerative arthritis and an asymmetric bulging disc at L2-3 were revealed in the MRI of the lumbar spine, and X-rays revealed straightening of

the normal lumbar lordosis, degenerative disc T12-L1 with associated disc calcification, partial fusion of the right transverse process at L5 with S1 with a pseudoarticulation and secondary sclerosis, and bilateral nephrolithiasis. (Tr. 387, 390). X-rays of the bilateral hips showed both hips were normal. (Tr. 388).

On September 6, 2002, Plaintiff saw Dr. Joseph Jestus for a neuorsurgical opinion on his neck, arm, back, and right leg pain. (Tr. 477). While the MRI scan of his lower back revealed evidence of a sacralized L5 segment, Dr. Jestus noted that there was no evidence of disc herniation, significant disc degeneration, spinal stenosis, or tumors. *Id.* Dr. Jestus diagnosed Plaintiff with a C5-6 disc herniation, and spinal stenosis at C4-5, C5-6, and C6-7. (Tr. 478). Plaintiff declined to accept Dr. Jestus's offer to do a myelogram, and Dr. Jestus also indicated concern that with eight years of back and neck pain, Plaintiff may not be operable. *Id.*

Plaintiff was admitted to Livingston Regional Hospital on January 26, 2003 and April 10, 2003 after being involved in separate motor vehicle accidents. (Tr. 534, 542). Plaintiff was assessed with multiple contusions after the January 26 accident and doctors advised him to take his pain medications at home. (Tr. 542-48). The radiology report, lumbar spine report, and thoracic spine report conducted after the April 10 accident all showed mild degenerative bony and disc space changes, otherwise unremarkable. (Tr. 536). Neither accident resulted in any broken bones. (Tr. 536, 548).

On April 18, 2003, Plaintiff was involved in a "bad" motor vehicle accident, and has not worked since the accident occurred. (Tr. 578-79). Plaintiff frequently visited Dr. Jones afterwards, seeing him several times from May 6, 2003 through November 1, 2005. (258-64, 302-06, 313-18). On May 6, 2003, Dr. Jones diagnosed Plaintiff with severe neck pain, a ruptured cervical disc, severe degenerative arthritis, and medication abuse. (Tr. 264). He noted

that Plaintiff needed to be weaned off of Hydrocodone, but he continued prescribing the drug. *Id.* In subsequent visits, Dr. Jones reiterated that Plaintiff could not tolerate an operation to relieve his pain. (Tr. 258-64). On December 9, 2003, Dr. Jones prescribed Diavam along with Plaintiff's prescription for Hydrocodone. (Tr. 262). Dr. Jones indicated on July 22, 2004 that Plaintiff was too disabled to do any kind of gainful employment. (Tr. 304). Through November 1, 2005, Dr. Jones did not note any change in Plaintiff's diagnosis or condition and continued him on his prescribed medications. (Tr. 313-18).

Plaintiff also visited Dr. Schooley four times between May 28, 2003 and September 9, 2003. (Tr. 220-21). On May 28, Plaintiff reported back pain, neck pain, and pain down both arms, the right arm pain greater than the left. (Tr. 221). Dr. Schooley scheduled a CT scan of the cervical spine for June 24, 2003, which revealed disc degeneration, spondylosis, and posterior osteophytes impinging on the spinal cord and significantly narrowing the spinal canal at C4-5, C5-6, and C6-7, and a moderately severe right foraminal narrowing at C4-5 and C6-7. (Tr. 235-36). Further, the scan showed a small central disc protrusion and/or osteophyte at C3-4 contacting the cord and moderately narrowing the canal, as well as a benign appearing gas-filled cyst or Schmorl's node deformity at C4. (Tr. 236).

Dr. Schooley also scheduled a cervical spine MRI for July 15, 2003, which revealed multilevel cervical spondylosis, most significant at C4-5 through C6-7, disc bulges at C4-5 through C6-7, and osteophytes at C4-5 through C6-7. (Tr. 233). On August 12, 2003, Plaintiff returned to Dr. Schooley reporting pain in his shoulders, neck, and between his shoulder blades. (Tr. 220). Plaintiff suggested that they try traction for another month because it helped the last time he used it, and on September 9, 2003, Plaintiff reported that he was doing well and was happy with the results of the traction. *Id.*

Additionally, Dr. Schooley referred Plaintiff to Neurosurgical Associates for pain management services. (Tr. 297). Plaintiff visited Dr. John Culclasure six times between November 24, 2003 and October 5, 2004. (Tr. 287-301, 363-65). On November 24, 2003, Plaintiff described his pain as sharp, cramping, unbearable, and "pins and needles," and classified his pain as an eight on a scale of one through ten. (Tr. 297). Dr. Culclasure prescribed Gabitril, Baclofen, Lortab, Soma, and a Medrol Dose Pak. (Tr. 301). During his subsequent appointments, Plaintiff reported similar pain levels, and Dr. Culclasure refilled his prescriptions for Lortab and Soma. (Tr. 290-301). While Dr. Culclasure did not indicate any evidence of substance abuse, he noted that Plaintiff did not bring his medications to his appointments on May 18, 2004 and October 5, 2004 for a pill count as required. (Tr. 292, 365). On July 16, 2004, Dr. Culclasure noted that Plaintiff reported improvements in his pain and that he was stable on his prescribed medication. (Tr. 290).

Dr. Dan S. Sanders reviewed Plaintiff's records and completed a Residual Functional Capacity ("RFC") Assessment of Plaintiff on May 3, 2004. (Tr. 249-54). Dr. Sanders concluded that Plaintiff could occasionally lift fifty pounds and frequently lift twenty-five pounds. (Tr. 250). Plaintiff could stand and/or walk about six hours and sit about six hours in an eight-hour workday. *Id.* Plaintiff's ability to push and/or pull was unlimited. *Id.* Dr. Sanders also concluded that Plaintiff could frequently climb, balance, stoop, kneel, crouch, or crawl and had no manipulative, visual, hearing/speaking, or environmental limitations. (Tr. 251-52).

On November 5, 2004, Dr. Culclasure prepared a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Tr. 566-69). Dr. Culclasure concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently. (Tr. 566). Dr. Culclasure also noted that Plaintiff was limited in neither standing and/or walking nor sitting. (Tr. 567). Pushing

and/or pulling were limited in the upper extremities, but Plaintiff would not be required to periodically alternate sitting and standing to relieve pain or discomfort.. *Id.* To support these conclusions, Dr. Culclasure cited Plaintiff's disc degeneration, spondylosis, and posterior osteophytes. *Id.* Plaintiff's pain would often be severe enough to interfere with attention and concentration, and he would need to take unscheduled breaks every two hours during an eight-hour workday. (Tr. 568). Plaintiff's impairments would sometimes produce "bad days" such that he would need to be absent from work about once a month. *Id.* Dr. Culclasure noted postural limitations as well: Plaintiff could only occasionally climb, but could frequently balance, kneel, crouch, crawl, and stoop. *Id.* Moreover, Plaintiff was occasionally limited in reaching in all directions, and was frequently limited in handling, fingering, and feeling. (Tr. 568-69). As support for his conclusions on Plaintiff's postural and manipulative limitations, Dr. Culclasure cited Plaintiff's bilateral upper extremity radiculopathy, which caused increased pain and numbness in his hands. (Tr. 569). Dr. Culclasure concluded that Plaintiff was capable of performing low-stress jobs. (Tr. 568).

Dr. Jones completed a medical source statement on November 10, 2004. (Tr. 309-12). He concluded that Plaintiff could lift ten pounds both occasionally and frequently. (Tr. 309). Plaintiff could stand and/or walk less than two hours in an eight-hour workday and could sit about four hours in an eight-hour workday. (Tr. 310). Pushing and/or pulling were limited in the upper extremities, and Plaintiff would be required to periodically alternate sitting and standing to relieve pain or discomfort. *Id.* To support these conclusions, Dr. Jones cited Plaintiff's thoracic spine and cervical spine MRI. *Id.* Plaintiff's pain would constantly be severe enough to interfere with attention and concentration, and he would need to take unscheduled breaks during an eight-hour workday. (Tr. 311). Plaintiff's impairments would sometimes produce "bad days" such

that he would need to be absent from work more than four times a month. *Id.* Dr Jones also noted postural limitations: Plaintiff could only occasionally balance and could never climb, kneel, crouch, crawl, or stoop due to his cervical and thoracic disc disease. *Id.* Moreover, Plaintiff was occasionally limited in reaching in all directions, but was unlimited in handling, fingering, and feeling. (Tr. 311-12). Plaintiff has no visual or communicative limitations, but Dr. Jones listed vibration and hazards (machinery, heights, etc.) as environmental limitations. (Tr. 312).

On December 2, 2004, Dr. Schooley prepared a medical source statement, reaching conclusions nearly identical to those Dr. Culclasure reached in his medical source statement. (Tr. 563-65). To support his conclusions, Dr. Schooley cited Plaintiff's disc degeneration and bilateral upper extremity radiculopathy. (Tr. 563, 565).

On September 9, 2006, Dr. Jerry Lee Surber examined Plaintiff upon his request for a disability evaluation and prepared a medical source statement. (Tr. 319-27). Dr. Surber concluded that Plaintiff could occasionally lift up to fifteen pounds and frequently lift less than ten pounds. (Tr. 324). Plaintiff could stand and/or walk up to two to four hours in an eight-hour workday and could sit from four to six hours in an eight-hour workday. (Tr. 323). Pushing and/or pulling were limited in the upper extremities. (Tr. 325). *Id.* Plaintiff had postural limitations as well: he could only occasionally balance, kneel, crouch, crawl, or stoop, and could never climb. *Id.* To support these conclusions, Dr. Surber cited Plaintiff's constant neck and back pain, and his limping antalgic gait demonstrated during the examination. *Id.* Further, Plaintiff was occasionally limited in reaching in all directions, but was unlimited in handling, fingering, and feeling. (Tr. 326). Plaintiff had no environmental limitations and was unlimited in seeing and speaking, but was limited in his hearing ability. (Tr. 326-27). In his treatment notes, Dr. Surber also indicated that while Plaintiff had moderate to severe limitation regarding the

movement of both his neck and shoulders, Plaintiff drove himself to and from the clinic.  (Tr. 322-23).

On November 6, 2006, Dr. Copeland discharged Plaintiff from his clinic after receiving an anonymous phone call that Plaintiff was receiving multiple medications from multiple physicians.  (Tr. 393).  Dr. Copeland noted that Plaintiff violated the terms of their narcotic agreement by failing to show up for a pill count scheduled for October 27, 2006.  *Id.*

On November 28, 2006, Dr. Michael T. Cox examined Plaintiff upon his request and prepared a medical source statement.  (Tr. 328-37).  Dr. Cox concluded that Plaintiff could lift ten pounds occasionally and five pounds frequently.  (Tr. 334).  Plaintiff could stand and/or walk about six hours in an eight-hour workday and could sit about six hours in an eight-hour workday.  (Tr. 334-35).  Pushing and/or pulling were limited in both the upper and lower extremities, and Plaintiff would be required to periodically alternate sitting and standing to relieve pain or discomfort..  (Tr. 335).  To support these conclusions, Dr. Jones cited Plaintiff's degenerative disc disease of both the cervical and lumbar spines.  *Id.*  Plaintiff had postural limitations as well: he could only occasionally climb and could never balance, kneel, crouch, crawl, or stoop due to his degenerative disc disease.  *Id.*  Moreover, Plaintiff was occasionally limited in reaching in all directions, but was unlimited in handling, fingering, and feeling. (Tr. 336).

Upon Plaintiff's request, Dr. Jones prepared a second medical source statement on April 25, 2007.  (Tr. 342-44).   He concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently.  (Tr. 342).  Plaintiff could stand and/or walk less than two hours in an eight-hour workday and could sit less than two hours in an eight-hour workday. (Tr. 342-43).  Plaintiff would be required to periodically alternate sitting and standing to relieve pain or discomfort.  (Tr. 343).  To support these conclusions, Dr. Jones cited Plaintiff's severe cervical

degenerative disc disease and the opinion that he was inoperable.  *Id.*  Plaintiff's pain would constantly be severe enough to interfere with attention and concentration, and he would need to take unscheduled breaks every 30 minutes during an eight-hour workday.  *Id.*  Plaintiff's impairments would sometimes produce "bad days" such that he would need to be absent from work more than four times a month.  *Id.*  Dr. Jones also noted that Plaintiff had manipulative limitations: he was constantly limited in reaching, handling, fingering, and feeling. (Tr. 344).

On September 22, 2007, Plaintiff was admitted to Livingston Regional Hospital after being found unresponsive on his neighbor's porch with white powder around his mouth and nose. (Tr. 487).  Plaintiff was incoherent and unresponsive upon arrival at the hospital, and doctors assessed a drug overdose by inhalation.  *Id.*  Although Plaintiff denied drug use, a search of his home uncovered crushed-up pills.  *Id.*  A cranial CT scan was normal, and Plaintiff was released on the same date after being treated with Narcan.  (Tr. 487, 499).

Plaintiff visited Dr. Jones several times between January 27, 2009 and April 27, 2009. (Tr. 366-67, 553-61).  On January 27, Dr. Jones noted that Plaintiff had gained about 40 pounds since his last visit.  (Tr. 367).  Plaintiff was diagnosed with severe neck pain, degenerative disc disease, and degenerative arthritis, and Dr. Jones prescribed Hydrocodone, Generic Soma, and Alprazolam.  *Id.*  Dr. Jones completed another medical source statement on April 27, 2009, and concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently.  (Tr. 554-57).  Plaintiff could stand and/or walk less than two hours in an eight-hour workday and could sit less than two hours in an eight-hour workday. (Tr. 554).  Plaintiff would be required to periodically alternate sitting and standing to relieve pain or discomfort..  (Tr. 555).  To support these conclusions, Dr. Jones cited Plaintiff's severe cervical degenerative disc disease.  *Id.* Plaintiff's pain would constantly be severe enough to interfere with attention and concentration,

and he would need to take unscheduled breaks every thirty minutes during an eight-hour workday. *Id.* Plaintiff's impairments would sometimes produce "bad days" such that he would need to be absent from work more than four times a month. *Id.* Moreover, Plaintiff was constantly limited in reaching, handling, fingering, and feeling. (Tr. 556). Plaintiff had no visual or communicative limitations, but Dr. Jones noted that Plaintiff should avoid concentrated exposure to hazards. (Tr. 557). In declining to in indicate any postural limitations, Dr. Jones noted that Plaintiff's limitations were primarily in his upper body. (Tr. 556).

On February 23, 2009, Mark A. Loftis, M.A., SPE performed a consultative psychological examination on Plaintiff. (Tr. 368-76). Plaintiff reported he was seeing Dr. Jones, denied ever receiving counseling or psychiatric care, and reported that the was taking Xanax, Soma, and Hydrocodone. (Tr. 369). Plaintiff stated that he goes to bed sometime between 11:00 p.m. and 12:00 a.m. and gets up sometime between 8:00 a.m. and 10:00 a.m. the next day. (Tr. 370). Plaintiff does not own a vehicle, but his son picks Plaintiff and his wife up once a week to go grocery shopping. *Id.* In addition, Plaintiff goes to the church across the street from his house and watches television to pass the time. *Id.*

Mr. Loftis measured Plaintiff's abilities in World Reading at a sixth grade, fourth month level with a standard score of 79, and measured Plaintiff's abilities in Math Computation at a sixth grade, fifth month level with a standard score of 87. (Tr. 371). In regards to his intellectual functioning, Plaintiff's measured general intelligence is in the Borderline Range, and taking into account Plaintiff's education, adaptive, and work histories, his general intelligence is in the Low Average range. (Tr. 372). Plaintiff has a functional level of literacy commensurate with his general intelligence, and his verbal skills are adequate. *Id.* Mr. Loftis noted that Plaintiff was not suicidal or homicidal and there was no overt indication of anxiety. *Id.* He assessed Plaintiff as

having a mild to moderate impairment in understanding and recalling instructions, concentration skills, persistence and ability to maintain a competitive pace, and ability to adapt to changes found in most work situations. (Tr. 372-73). Mr. Loftis also concluded that simple, repetitive tasks are not likely to be impaired. (Tr. 372).

At the request of the State of Tennessee Disability Determination Section, Dr. Horace E. Watson performed a consultative orthopedic examination on Plaintiff on March 5, 2009. (Tr. 377-83). In his medical source statement, Dr. Watson concluded that Plaintiff could lift and carry up to twenty pounds occasionally and up to ten pounds frequently. (Tr. 378). Plaintiff could stand and/or walk four hours at one time and eight hours total in an eight-hour workday and could sit four hours at one time and eight hours total in an eight-hour workday. (Tr. 379). Plaintiff can never push or pull with his right hand, but he can occasionally reach and frequently handle, finger, or feel with his right hand. (Tr. 380). Plaintiff can also frequently reach, handle, finger, feel, and push/pull with his left hand. *Id.* Dr. Watson noted postural limitations: Plaintiff can only occasionally climb, balance, kneel, crouch, crawl, or stoop. (Tr. 381). While Plaintiff has occasional environmental limitations, these impairments do not affect his hearing or vision. (Tr. 381-82). Dr. Watson also noted that Plaintiff can perform activities such as shopping, using public transportation, caring for his personal hygiene, and traveling without a companion. (Tr. 383).

### B.     Hearing Testimony

As noted in the procedural history, Plaintiff testified twice before an ALJ. On March 13, 2006, Plaintiff testified that he graduated from high school in 1975, and that he did not receive any technical or vocational training after high school. (Tr. 573). He testified that he has constant neck and back pain, and pain between his shoulder blades, down both arms, and into his hands.

(Tr. 575-76).  Due to the pain in his hands, he has to take both hands to lift a gallon of milk or pour a glass of milk, and he cannot open a soft drink bottle with a screw-off top.  (Tr. 576).  The pain wakes him up about four or five times a night.  (Tr. 577).  Plaintiff testified that after his surgery in 1994, he continued to work with the help of stronger medication even though the pain was increasing.  (Tr. 578-79).  After his motor vehicle accident in April 2003, Plaintiff testified that he had to quit work because of the pain.  (Tr. 579).  Plaintiff indicated that he can sit an hour at most before the pain gets too strong, and can also stand an hour at most on a good day before the pain gets too strong.  *Id.*  He can stand for thirty minutes on an average day, and has to constantly change positions between sitting and laying on the couch.  (Tr. 580).  His constant pain is approximately between a seven and an eight on a ten-point scale, and he has bad days about twice a week.  (Tr. 580-81).  Plaintiff testified that he occasionally walks next door to visit his mother, whose house is about fifty yards away.  (Tr. 581).  He also goes to the grocery store about once a week if he is able, and at the time of the hearing he had driven to the grocery store twice in the last month.  (Tr. 581-82).  Plaintiff also testified that he has had some depression, but has never received any treatment.  (Tr. 584).

The vocational expert, Dr. Julian Nadolsky, testified that an individual of age 49 with marginal to limited literacy and degenerative disc disease of the neck limiting him to light exertion could perform Plaintiff's past work as a furniture assembler, but not his work as a logger.  (Tr. 586).  Such an individual could also perform many similar light, factory-type jobs, such as switchbox assembler, hand packager, grinding machine operator, hardware assembler, and case packager.  *Id.*  The vocational expert testified that there are 1,500 such jobs within a 75 mile radius of Plaintiff's home in Gainesboro, Tennessee, and more than 1.5 million such jobs across the nation.  (Tr. 586-87).  If the individual had to alternate positions from sitting or

standing and walking at 30-minute to 1-hour intervals, he would not be able to perform Plaintiff's past relevant work. (Tr. 587). With that type of limitation, Plaintiff could perform approximately 20 percent of the light jobs Dr. Nadolsky previously testified to. *Id.* Dr. Nadolsky also testified that employers in these types of jobs would tolerate a maximum average of two absences a month. (Tr. 588). Plaintiff's need to alternate between sitting and standing or walking would have a lesser effect on sedentary jobs, but there would be a lesser number of sedentary jobs he could perform. (Tr. 588-89). At the sedentary level he would only be able to perform about 300 jobs in the local labor market and about 450,000 nationwide. *Id.*

The ALJ held another hearing on May 31, 2007 and conducted a supplemental examination of Dr. Nadolsky. (Tr. 591-602). He testified that a 50 year-old individual closely approaching into advanced age who could stand or walk a total of six hours in combination or sit a total of six hours in combination per day, while alternating every 30 minutes and avoiding stooping could not perform Plaintiff's past relevant work. (Tr. 595-96). An individual with these limitations could perform jobs such as a hardware assembler, switchbox assembler, oil filter inspector, decal applier, hand packager, gate tender, retail receiving clerk in a laundry or dry-cleaning establishment, automobile self-service station attendant, and delivering flowers or pizza. (Tr. 596). Dr. Nadolsky testified that there are approximately 1,500 of these jobs in the local labor market and approximately 2 million jobs nationwide. (Tr. 596-97). He also opined that Plaintiff could do his previous job as a furniture assembler if he could be on his feet longer than 30 minutes at a time. (Tr. 598). An individual with limitations on standing or walking and sitting who also has only occasional use of his hands would not be able to perform any light jobs, but would be able to perform some sedentary jobs, such as a surveillance systems monitor (100 jobs in the local market, 500,000 nationwide). (Tr. 598-600). Dr. Nadolsky also testified that an

individual with such limitations who was also limited to occasionally lifting ten pounds and frequently lifting five pounds and limited in both upper and lower extremities would not be able to perform light jobs. (Tr. 601). Such an individual could perform sedentary jobs such as a surveillance systems monitor, but unskilled jobs requiring only occasional reaching are extremely limited. *Id.*

At his hearing on April 29, 2009, Plaintiff testified that he still has pain in his back and neck, and that the medications prescribed by his primary care physician Dr. Jones do not alleviate the pain much. (Tr. 609). Plaintiff went through a period where he did not see a doctor and was without prescribed medication, and he described his pain during that period as about a nine on a scale of zero to ten. *Id.* The medications he was taking at the time of the hearing lowered his pain level to about a six or a seven on a scale of zero to ten. (Tr. 610). Plaintiff testified that he cannot lift overhead and needs to use his left arm to hold up his right arm. *Id.* He also testified that he tried to do the dishes once since the hearing on April 13, 2006, but he couldn't complete the task because the pain was too bad. (Tr. 611).

The Vocational Expert, Anne B. Thomas, testified that an individual approaching into advanced age of nearly 52 who reads at a marginal to limited level of literacy and has a history of neck surgery and injuries to the cervical spine with degenerative changes such that he is limited to light exertion could not perform Plaintiff's past relevant work. (Tr. 614). Such an individual could perform some light, unskilled jobs such as a production laborer (12,000 jobs in Tennessee, 350,000 in the U.S.), hand packer (1,000 jobs in Tennessee, 200,000 in the U.S.), and production assembler (1,100 jobs in Tennessee, 470,000 in the U.S.) *Id.* She also testified that if such an individual could sit eight hours a day, four hours at a time; stand eight hours a day, four hours at a time; occasionally reach with the right hand up to one-third of the day; and occasionally stoop

and kneel, it would decrease the number of jobs previously cited by 20 percent. (Tr. 615). This opinion would not change if the individual had a low/average IQ and mild to moderate emotional limitations due to an anxiety disorder and other emotional problems. *Id.* The opinion would also not change if the individual might miss one day of work a month and was additionally limited to occasionally lifting 20 pounds, occasionally reaching with either arm, and occasionally climbing, and limited to frequently lifting 10 pounds and frequently handling, feeling and fingering. (Tr. 615-16). If the individual needed unscheduled breaks every two hours in an eight-hour workday, he could not perform the work described. (Tr.. 617). Ms. Thomas also suggested that an individual with a severe pain level of about nine on a scale of zero to ten would not be able to perform the work described. (Tr. 619).

### III. PLAINTIFF'S STATEMENT OF ERRORS AND CONCLUSIONS OF LAW

Plaintiff cites two alleged errors committed by the ALJ. First, the ALJ erred in rejecting the opinions of Plaintiff's treating physicians, Dr. Jones, Dr. Culclasure, and Dr. Schooley. Second, the ALJ erred in rejecting the opinions of Plaintiff's consultative physicians, Dr. Surber and Dr. Cox.

A.     Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *See Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999)

(citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It has been further quantified as "more

than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner*, 105 F.3d

244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the

decision of the ALJ must stand if substantial evidence supports the conclusion reached.  *Her*, 203

F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  However, failing to

consider the record as a whole undermines the commissioner's conclusion.  *See Hurst v.

Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.      Proceedings at the Administrative Level

        The Claimant has the ultimate burden to establish an entitlement to benefits by proving

his or her "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 423(d)(1)(A).  At the administrative level of review, the claimant's case is considered

under a five-step sequential evaluation process as follows:

1.      If the claimant is working and the work constitutes substantial gainful activity, benefits are
        automatically denied.

2.      If the claimant is not found to have an impairment which significantly limits his or her
        ability to work (a "severe" impairment), then he or she is not disabled.

3.      If the claimant is not working and has a severe impairment, it must be determined whether
        he or she suffers from one of the "listed" impairments[1] or its equivalent; if a listing is met
        or equaled, benefits are owing without further inquiry.

4.      If the claimant does not suffer from any listing-level impairments, it must be determined
        whether the claimant can return to the job he or she previously held in light of his or her
        residual functional capacity (*e.g.*, what the claimant can still do despite his or her
        limitations); by showing a medical condition that prevents him or her from returning to

_____

        [1] The Listing of Impairments is found at 20 C.F.R., pt. 404, Subpt. P, App. 1.

such past relevant work, the claimant establishes a *prima facie* case of disability.

5.      Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Even once the analysis has reached step five, it remains the burden of the claimant to prove the extent of the disability. *Her*, 203 F.3d at 391. In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.      The ALJ Properly Evaluated the Opinions of Plaintiff's Treating Physicians

An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(i)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 , 287 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship

and the frequency of examinations, the medical evidence supporting the opinion, the consistency

of the opinion with the record as a whole, the specialization of the treating source, and any other

factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v.*

*Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

As an initial matter, in determining Plaintiff's residual functional capacity the ALJ relied

primarily on the opinions of Dr. Culclasure, Plaintiff's pain management specialist, Dr. Schooley,

Plaintiff's neurosurgeon, and Dr. Watson, who performed a consultative orthopedic examination

of Plaintiff on March 5, 2009. (Tr. 20-21). Dr. Culcalsure's treatment relationship with Plaintiff

encompassed six visits from November 2003 through October 2004, and Dr Schooley's treatment

relationship with Plaintiff encompassed nine visits from October 2001 through September 2003.

(Tr. 219-38, 287-301, 363-65).

Plaintiff contends that the restrictions set forth by Dr. Culclasure and Dr. Schooley will not

allow work and that the ALJ erred in rejecting their opinions. The ALJ, however, merely rejected

their shared opinion that Plaintiff would need unscheduled breaks every two hours during an

eight-hour workday, and appeared to rely on the rest of their analysis of Plaintiff's limitations.

(Tr. 20). As for their opinion that Plaintiff would need to take unscheduled breaks every 2 hours,

the ALJ's decision to discredit this portion of their medical source statements is supported by

substantial evidence. Specifically, the medical source statements prepared by both Dr. Culclasure

and Dr. Schooley do not provide any indication that Plaintiff would need unscheduled breaks

every two hours. Both Dr. Culclasure and Dr. Schooley opined that Plaintiff was unlimited in his

ability to sit, stand, or walk during an eight-hour work day, which is inconsistent with the opinion

that Plaintiff would need an unscheduled break every two hours. There is also objective evidence

in Dr. Schooley's treatment notes that is inconsistent with his opinion that Plaintiff would require

frequent breaks during an eight-hour workday. Dr. Schooley noted during a visit by Plaintiff in September 2003, which was approximately five months after Plaintiff's serious motor vehicle accident, that Plaintiff was happy with the results of his traction, was up and ambulatory, and that his pain and numbness were improving. (Tr. 220). Accordingly, the ALJ's decision to discredit the opinion of Dr. Culclasure and Dr. Schooley that Plaintiff would require unscheduled breaks every two hours during an eight-hour workday is supported by substantial evidence.

Plaintiff also contends that the ALJ erred in discrediting the opinion of Dr. Jones, Plaintiff's primary care physician. Dr. Jones had a particularly long treatment relationship with Plaintiff, as Plaintiff frequently visited Dr. Jones from June 1999 through November 2005, and then began visiting him again from January 2009 through April 2009. (Tr. 255-86, 302-08, 313-18, 336-67, 553-61). Despite the length of the treatment relationship between Plaintiff and Dr. Jones, there is evidence in the record that weighs against the determination of Plaintiff's RFC made by Dr. Jones in the medical source statement prepared in April 2009. Dr. Jones opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, that he could stand or walk less than 2 hours in an eight-hour workday and sit less than two hours in an eight-hour workday, and that he would need to take unscheduled break every thirty minutes. (Tr. 554). However, the ALJ noted that Dr. Jones also concluded Plaintiff had no postural limitations and his limitations were primarily in his upper body, which is consistent with limitations in pushing and pulling with the upper extremities but inconsistent with limitations on sitting, standing, or walking. (Tr. 21, 556).

In discrediting the opinion of Dr. Jones, the ALJ also noted that with respect to the area of Plaintiff's exertion ability, he accorded great weight to the medical source statement prepared by Dr. Watson following the consultative orthopedic examination on March 5, 2009. (Tr. 21). Dr.

Watson's opinion regarding Plaintiff's limitations in pushing and pulling with the upper extremities is consistent with the assessments of the other doctors, including Dr. Jones. However, Dr. Watson indicated that Plaintiff could stand or walk four hours at a time and eight hours total in an eight hour work day, and could sit four hours at a time and eight hours total in an eight-hour work day, which differs from Dr. Jones's opinion that Plaintiff is severely limited in his ability to sit, stand, and walk and would require breaks every thirty minutes. While Dr. Watson only saw Plaintiff once and does not qualify as a treating physician, his opinion is supported by substantial evidence in the record, as treating physicians Dr. Schooley and Dr. Culclasure were both less conservative in their evaluation of Plaintiff's limitations in sitting, standing, and walking.

While Plaintiff does not argue in his Brief in Support of Motion for Judgment on the Administrative Record that the ALJ erred in dismissing Plaintiff's subjective complaints of pain, the ALJ noted that the opinions of conservative physicians such as Dr. Jones may be based on Plaintiff's recitations of his own limitations. (Tr. 22). In discounting the opinions of the conservative physicians, the ALJ noted that he did not find Plaintiff's subjective complaints of pain credible. *Id.* Specifically the ALJ indicated that Dr. Jones's treatment notes reflect medication abuse throughout a majority of their treatment relationship and that in June 2002 Plaintiff requested too much medication. (Tr. 22). Plaintiff stopped working and visited Dr. Jones frequently after being involved in a serious motor vehicle accident on April 18, 2003, yet Dr. Jones continued to diagnose Plaintiff in the same manner and prescribe the same medication that Plaintiff had been taking prior to the accident, when Plaintiff was still employed. (Tr. 258-64, 302-06, 313-18). Further, Plaintiff forgot to bring his medication to his visits to Dr. Culclasure in May 2004 and October 2004 for the required pill count, and was also discharged from Dr. Copeland's clinic for forgetting to bring his medication. (Tr. 292, 365, 393).

In discrediting the opinion of Dr. Jones, Plaintiff's primary care physician, the ALJ cited the opinions of two treating physicians who opined that Plaintiff could perform low-stress jobs, and a consultative orthopedic specialist who examined Plaintiff about a month before Dr. Jones prepared his third medical source statement. The ALJ's decision to discredit Plaintiff's subjective complaints of pain in rejecting the opinion of Dr. Jones is also supported by substantial evidence. Accordingly, the ALJ properly considered the opinions of Plaintiff's treating physicians.

D.     The ALJ Properly Evaluated the Opinions of Plaintiff's Consultative Physicians

Plaintiff contends that the ALJ erred in rejecting the opinions of Plaintiff's consultative physicians, Dr. Surber and Dr. Cox, who each examined Plaintiff in 2006 and prepared a medical source statement. The ALJ does not specifically discount the opinions of Dr. Surber and Dr. Cox in his unfavorable decision of April 2009, but he does note observations made by both doctors in his determination that Plaintiff can perform light work. (Tr. 22). Moreover, the ALJ specifically rejected the opinions of Plaintiff's consulting doctors in his unfavorable decision in June 2007, before Plaintiff appealed the decision that he was not disabled. (Tr. 58).

The distinction between treating and nontreating medical sources determines the level of weight the ALJ must afford their opinions. Treating sources are distinguished by an "ongoing treatment relationship" with the patient. 20 C.F.R. §§ 404.1502, 416.902. Generally speaking, this "ongoing treatment relationship" is determined by its frequency and context.[2] *Id.*

_____

[2]20 C.F.R. § 404.1502: "Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has

The ALJ is not required to explain or list reasons for discounting the opinions of nontreating medical sources. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004). The record indicates that Dr. Surber and Dr. Cox each only saw Plaintiff once. Given the range and complexity of Plaintiff's numerous health problems outlined in the 620-page record, said visits do not establish an "ongoing treatment relationship." As such, Dr. Surber and Dr. Cox do not qualify as treating medical sources. The ALJ did not err in discounting their opinions.

Even if the opinions of Dr. Surber and Dr. Cox are given extra weight, the ALJ provided sufficient evidence to reject their opinions. Dr. Surber concluded that Plaintiff could "possibly" occasionally lift up to fifteen pounds and frequently lift less than ten pounds, and is limited when it comes to standing, sitting, walking, pushing, pulling, and working a continuous eight-hour day. (Tr. 323-27). However, Dr. Surber's examination notes reflect that Plaintiff, despite claims of severe pain in his neck, was seen driving his automobile to and from the examination. (Tr. 323). Moreover, Dr. Cox opined that Plaintiff could lift ten pounds occasionally and five pounds frequently. (Tr. 334). Plaintiff could stand and/or walk about two to four hours in an eight-hour workday and is limited when it comes standing, sitting, walking, pushing, pulling, and working a continuous eight-hour day. (Tr. 334-36). Dr. Cox also noted, however, that Plaintiff had normal gait and station, no motor or sensory loss, and no joint abnormalities clinically. (Tr. 328-31). To

---

treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source."

the extent that the ALJ should have considered the opinions of Dr. Surber and Dr. Cox, he correctly rejected their opinions because the conclusions reached were inconsistent with their medical observations.

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and the action be **DISMISSED**

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 11th   day of July, 2012.


/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge